**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| QMAXX PRODUCTS GROUP, INC., | ) Case No. 20-41063-659 |
| | ) Honorable Kathy Surratt-States |
| | ) Chapter 11 |
| | ) |
| Debtor. | ) |

**REPLY TO OBJECTIONS OF PETITIONING CREDITORS
AND ALLEGED DEBTOR TO MOTION TO ABSTAIN**

COME NOW TexDev LLC, SBC Investments, LLC, Ben Block, Craig Hiddleston, Mitchell B. Holdings 77 Inc., and Bryan Jordan (the "Lender Group") and for their Reply state to the Court as follows:

**INTRODUCTION**

The Petitioning Creditors paint a picture of a nefarious scheme by Craig Hiddleston ("Hiddleston") and the other members of the Lender Group, who allegedly orchestrated a default under the Third Amended and Restated Secured Convertible Promissory Note ("Note") in order to steal a multi-million dollar company. While the Petitioning Creditors Objection makes for an engrossing read, as good as any well-written fictional account, the facts and reality are quite different and much more nuanced. While there appears to be competing narratives, there are still solid and undeniable truths and facts that no one can deny. This is no more than a two-party fight between those having an affiliation with QMAXX Products Group, Inc. ("QMaxx" or the "company"), that simply cannot perform in a chapter 11 bankruptcy case or provide value either in a chapter 11 or chapter 7 case. As a result, keeping this case in bankruptcy, for a company that has admittedly performed poorly, will only make matters worse by depressing value and racking up fees and expense. A dismissal of the case will provide the company with the prospects of

2503740.3

maintaining its core business, as the Lender Group is willing to proceed forward without foreclosing on certain assets under reasonable conditions that are described in this Reply. Consequently, for the reasons set forth herein, abstention and dismissal are warranted.

### FACTS

QMaxx was incorporated in 2013, although operations commenced as early as 2010. As with many start-ups with grandiose ideas, it was infused with capital and loans with the hope that the modern day gold rush remains alive. The business operations of manufacturing and distributing anti-corrosive and lubrication products was premised on the success of certain intellectual property in the form of new technology and patents and the raising of substantial additional capital. Over the years, from late 2014 through the summer of 2019, the Lender Group provided the funding incrementally for this start-up by infusing capital of approximately $3,000,000 in exchange for Preferred Series A and B stock and approximately $600,000 of loans, evidenced by the Note[1] secured by the assets of the company. The funding was provided over time as QMaxx had no sustainable revenues and business. David McCreery ("McCreery"), an officer, director and principal shareholder, who invested no money personally, ran the company and hired a skeletal crew, some of which included his family members.

Under the leadership of McCreery, the company floundered and performed poorly, both financially and structurally. As the company ran out of money in 2018 and 2019, it was the Lender Group that came to its assistance by being able to secure additional funding. The company's revenues have been generally declining from approximately a high of $292,000 in 2016, $283,500 in 2017, $164,700 in 2018 and $218,000 in 2019 with losses in the millions of dollars. (See Exhibit 1) There was no profitability. The company survived only through the financial backing of the

---

[1] There were three previous notes, which were amended as loans were made to the company.

2503740.3

Lender Group. The Lender Group provided 72% of all the equity QMaxx ever raised, 68% of all the capital QMaxx ever raised and 87% of all the capital QMaxx raised since December 2016. During the years, McCreery was never able to obtain sustainable contracts, sales and licensing agreements for the various patents, some of which are still pending approval. In late 2017, McCreery began working with a capital raising advisor that McCreery selected; and it was McCreery who was the person having direct contact with that advisor. These efforts continued from late 2017 through much of 2019, without any success.

Likewise, the internal management under McCreery's tutelage was weak and lacking. The Petitioning Creditors suggested that the books and records and financial statements of the company were in such terrible condition due to Hiddleston and that such records could not be relied upon to support any equity infusion. The facts are quite different. Hiddleston was not responsible for the accounting and in fact did not have direct access to QMaxx's Quick Books accounting system. McCreery hired his daughter, who was not an accountant, and who was the person with exclusive access to the Quick Books system. She was the one who was responsible for the company's accounting and Quick Books accounting system until she left the employ of the company in around March of 2019. She was replaced by Patty Cross who left the company in May of 2019. Christine Bannes, the sister-in-law of Petitioning Creditor James Bannes, took Cross' place, who in turn was then replaced by Petitioning Creditor Stacey Brown in August of 2019.

Hiddleston's role was to review the financial statements generated by Quick Books, ensure certain recurring journal entries were made, review the statements generally and provide them to the company's investors. In general, the company's accounting and records were fairly simple and uncomplicated. Nevertheless, there were some problems. In 2019 is was identified that the method

2503740.3

of booking inventory transactions was not set up correctly. The 2019 year-end inventory reconciliation was very complicated because it involved numerous adjustments dating back to bookings in Quick Books by McCreery's daughter before the 2019 year-end financial statements could be ready. Furthermore, the tax returns, which were supervised and signed by McCreery, without any input from Hiddleston, did not match QMaxx's accounting records. This was a critical shortcoming when trying to satisfy investors' claims for reliable financial information because they demanded an explanation for why the tax returns did not match QMaxx's accounting records. No explanation could be provided other than McCreery did not bother to check for accuracy before signing them. Neither Hiddleston nor any other member of the Lender Group had direct access to the Quick Books system. Thus, any suggestion that the records were in shambles and that they were the result of Hiddleston's actions are patently false.

At all times, McCreery, an eternal optimist with unrealistic expectations, painted a picture of a rosy future, with the company on the cusp of profitability and a meteoric rise in sales. As time went by, the Lender Group did not share in such enthusiasm and whose views soured over time with the lack of success, the failure to increase revenues, and the failure to raise capital. In mid-2019, when the company was running out of money again, Hiddleston helped secure an additional investor/lender to provide some additional funding as well as secure increased lending commitments from the existing lenders to attempt to make ends meet. It was at this time that the loan documents were revised again, as the third amendment to the promissory note, to reflect the increase in funding.

In the fall of 2019, it was McCreery, not Hiddleston, who was responsible for the 50 million dollar valuation in what the Petitioning Creditors call the Offering Memorandum. While this document includes financial statements showing the company's historical bleak financial

2503740.3

performance (see pages 19-21 of Exhibit B to the Petitioning Creditors' Objection), the document painted a picture of profound optimism that sought investors at $1.15/share, which equates to a valuation of about $50,000,000.  The document also contained projections of rapid growth over the next three to five years, predicated on an infusion of substantial capital.  Hiddleston advised and reminded McCreery that QMaxx had never received an offer from potential investors in the range of the $1.15/share that McCreery had stuck to throughout 2018 and 2019 and that this valuation was too high.  Nevertheless, McCreery insisted that $1.15 per share be the basis of the valuation in the document circulated in the fall of 2019, the results of which were understandably a big thud.  There were no eager takers.

Also in the fall of 2019, the third quarterly interest payment was due under the Note.  At that time, there were insufficient funds to make this payment if QMaxx was also to pay to replace inventory for products with sales prospects.  Contrary to the Affidavit of Stacey Brown (Exhibit C to the Petitioning Creditor's Objection), it was not Hiddleston who made the decision to refuse the cure of the default.  Rather, Hiddleston, cognizant and sensitive of his role of wearing multiple hats and the potential inherent conflicts, expressly indicated that McCreery should make the decision as to payment. (See Exhibit 2).  Thus, Hiddleston did not manipulate the default or the failure to cure as suggested by the Petitioning Creditors.

In late 2019, having endured years of non-performance, the lack of strong leadership, the failure of McCreery and the company to raise capital, one of the members of the Lender Group retained counsel and asserted a default in the Note. When payment was not forthcoming and it was clear that all efforts had failed, counsel for the Lender Group scheduled a public sale of the collateral for February 28, 2020.  Contrary to the claims of Petitioning Creditors, the publication of the sale was not limited to one alleged obscure periodical.  Rather, at great cost, the sale was

2503740.3

advertised in eight different publications, many of which are specialized trade publications catered to the trade.  (See Exhibit 3)    At the cost of approximately $12,000, publication was advertised to over 730,000 viewers across multiple industries in multiple jurisdictions throughout the United States. Of the many viewers of the notice, it is significant that only three parties expressed any interest.   One party did not follow up and asked no meaningful questions.   A second party had no interest unless the intellectual property was generating meaningful income.  The third party had no interest unless the intellectual property were tied to a sales or licensing agreement.

   Shortly before the sale was to occur, three employees of QMaxx, one of whom was the son of David McCreery, filed the involuntary petition asserting $87,784.06 of unpaid wages or pay and expenses. The petition was amended without explanation to increase the amounts allegedly owed to $144,325.37 and thereafter a fourth employee joined in the petition.   At no time did any independent vendor or non-insider join in the petition. This filing was done as the company did not have the support of the board of directors or the shareholders, as any filing required the majority of the preferred shares. While the Petitioning Creditors assert that that the companying stopped paying employees for two years (as referenced in Exhibit B to the Petitioning Creditors), that is not true.  Rather the Petitioning Creditors agreed to reduced compensation and/or stock options, with no express agreement or promise of any material deferral of compensation, unless, of course, McCreery, without the support of the board of directors or the other shareholders, unilaterally promised additional compensation that the company could not afford.  For example, Stacey Brown, who joined the company in August of 2019, agreed to be paid at the rate of $20 per hour and was in fact paid these sums. She is alleging that she should be paid at multiples of this hourly rate. James Bannes agreed to reduced cash compensation in exchange for stock options yet his claim is for unpaid cash compensation despite being awarded those stock options. (See Exhibit

2503740.3

4) McCreery's son agreed to stock options, which were awarded to him. Jason Luzar, who had other employment outside of the company, received certain stock options in lieu of cash compensation including sales commissions.[2] Many unpaid expenses have also been asserted, but very few were asserted in expense reports and some were not approved reimbursable expenses. Suffice it to say that the extent of the debts are disputed, and that while there are some funds owed, these amounts may well be below the threshold for dollars required for the filing of an involuntary bankruptcy.

Since the filing of the case, the Lender Group and along with three of the four board members requested that McCreery, who had essentially shut out Hiddleston and the other members of the board, provide disclosure and access to financial records and information, access to and information about McCreery's efforts to raise capital and also disclosure of what debts are being incurred post-petition and are not being paid. All requests were ignored by McCreery and not forthcoming, causing the Lender Group to take the unusual and unprecedented step of seeking this information through formal discovery in the case, especially as these disclosures should have been made without Court intervention. The only drips and drabs of information disclosed came from counsel indicating that McCreery was continuing to work with an investment group in New York, but that there were no commitments for funding.

When those board members, who were stonewalled in their efforts to obtain financial disclosure, expressed concern about QMaxx's ability to pay the premiums for the D&O Insurance Policy and to pay the maintenance for certain pending patents, Hiddleston called a special board meeting, which was held on May 14, 2020. At the board meeting, McCreery disclosed that that the company was essentially out of cash (with less than $2,000 in the bank) and was unable to pay

---

[2] The stock options awarded to the various Petitioning Creditors are all contained and set forth in the books and records of the company.

2503740.3

the D&O premium or the patent maintenance expenses.  McCreery also acknowledged that the patents have uncertain value and appeared lukewarm on whether the payments should be made to maintain them.  Hiddleston indicated that while the values were uncertain, it would be worthwhile to pay the patent maintenance to preserve whatever value there might be. The board passed various resolutions to provide access to the board of financial records and Quick Books, which had been previously denied, and to pay the D&O premiums and patent maintenance to the extent of available funds. (See Exhibit 5, the board resolutions).  Interestingly, objections to providing disclosure to financial records and information were lodged by attorneys that were guests of McCreery at the board meeting, asserting that the agenda did not fully provide for such topics.  This is especially ironic considering that the board should have been provided with this information even without a meeting.[3]

Some other facts and issues are also worth mentioning in response to the Objections.  In its response to the Motion to Abstain, QMaxx, as the alleged debtor, through an attorney that was not approved to be employed by the Board, but was apparently employed by McCreery, asserted that the case could be funded through the collection and payment of a $641,000.00 note of Hiddleston to the Company.  What the Objection failed to mention was the fact that this note was previously cancelled in March of 2018 in exchange, in part, for the repurchase of certain shares of stock owned by Hiddleston as unanimously approved by the company, including McCreery.   (See Exhibit 6).

---

[3] At the board meeting, the directors also raised concerns why McCreery, although asked to do so, had failed to record with the USPTO the assignments he signed in March and April of 2015 whereby he assigned certain intellectual property to the company.  The concerns relate to the fact that the failure to record the assignment would harm the company as any purchaser of the intellectual property from McCreery could assert that it was a bona-fide purchaser for value, thereby allegedly defeating the ownership interest of the company.

2503740.3

In addition to the many years where funding was sought pre-petition, the funding efforts have continued post-petition for the three months since the involuntary was filed, all without success. Likewise, McCreery has purportedly sought to obtain DIP financing or other borrowing to fund a bankruptcy. Any funding, even if available, would require the vote of the preferred shareholders, which for reasons would be difficult to obtain for the reasons set forth herein. In short, McCreery has tried to raise funds, through capital investment or loans, without success. The Lending Group asserts that the aggregate costs of administration in this case over what is an internal company fight and the payment of any fully perfected liens of the Lender Group, whose total debt is about $750,000, far exceeds the illusory value of any assets. More importantly, the company does not have the financial resources to continue to operate.

## ARGUMENT

Not every distressed entity should be in bankruptcy. In fact, most financially distressed entities never file a chapter proceeding. Bluntly stated, bankruptcy cannot cure this company. Even assuming that the Petitioning Creditors had undisputed and non-contingent debts in an appropriate amount, which the Lender Group does not acknowledge, an involuntary chapter 11 makes no sense. The company has no money, has no reasonable prospects for funding, has no clear direction of how to proceed given the internal conflicts, has no right to borrow money over the objections of the shareholders and simply cannot pay its ongoing debts. The suggestion that an independent person could run the company is a fantasy, as there are no funds to pay such a person, even if there existed one who had the qualifications and knowledge to do so.

The alternative to a chapter 11 case is one under chapter 7. No chapter 7 trustee would have sufficient funding to maintain the patents, pay ongoing expenses, pay the cost of storage of records, maintain and pay personnel to assist him or her in the administration of the case or pay

2503740.3

accountants and attorneys' fees. A prime element of determining whether a case remains in bankruptcy is evaluating the cost of administration, which would be substantial in a case like this. See *In re NRG Energy, Inc*., 294 B.R. 71, 80 (Bankr. Minn. 2003). No chapter 7 trustee, or anyone else for that matter, has the expertise and ability to sell unproven intellectual property that generates no material income in a short period of time, which is what would be required, or to create value in excess of the administrative costs and the secured debt. History is clear that chapter 7 trustees, in spite of being told that unproven intellectual property has tremendous value, never are able to market and sell these assets, especially as marketing efforts have failed over a period of many years. Too often, start-ups, having raised a lot of initial capital, fail and fizzle out. This case is no different. Further, a chapter 7 trustee does not preserve jobs. Even in the unlikely event that a Hail Mary pass could be completed, any distributions to insiders, whose debts are disputed, would take years given the bureaucracy involved in the administration of chapter 7 corporate cases. No trustee would want to get into expensive and prolonged litigation over the existing disputes.

What is left is where we started, a two party fight. While the narratives of each side are remarkably different, certain facts are undisputed. There is an internal dispute. There is no money. The company has never performed. The patents have no track record. The cost of administration in corporate cases like this is overwhelming. Already, without much being accomplished, the amounts paid or incurred by QMaxx for attorneys' fees have exceeded $53,000 in a relatively short period of time. (See Exhibit 7) These cases are time consuming and patents, unlike a fine wine, do not improve with age. A two party fight, especially an internal dispute, as the Courts well recognize, is better left to Courts outside of the bankruptcy process. See *In re Diamondhead Casino Corporation*, 2016 WL 3284674 (Bankr. D. Del. 2016) (insider suits not

2503740.3

appropriately remedied by an involuntary bankruptcy); *In re Shar*, 253 B.R. 621 (Bankr. D. N.J. 1999); and *In re Jr. Food Mart of Arkansas, Inc.*, 241 B.R. 423 (Bankr. E.D. Ark. 1999). The bankruptcy court does not have core jurisdiction over these fights and the litigation would end up in the morass of the confusing tangled web of what is or is not within the province of bankruptcy court jurisdiction. If the Petitioning Creditors or McCreery want to fight and assert breaches of duty or seek an injunction with regard to any foreclosure sale, no matter how difficult and dubious those cause of actions may be, they have the appropriate forums to address them. See *In re Accident Claims Determination Corp.*, 146 B.R. 64, 67 (Bankr E.D.N.Y. 1992). In turn, one would fully expect vigorous defenses raised and where appropriate, counterclaims for alleged mismanagement and breaches. That there is no existing pending litigation does not mandate that the case remain in this Court. See *In re ABQ-MCB Joint Venture*, 153 B.R. 338, 342 (Bankr D. N. Mexico 1993) (the creditor was exercising its power or sale foreclosure rights, as the Lending Group was doing here, when the involuntary bankruptcy was filed). If there is an alternative forum, that would suffice, especially as the rationale for another forum for a two-party fight is the same, irrespective of a pending suit.

Petitioning Creditors assert that the best interests would be served to keep this case in bankruptcy in an effort to preserve value. The Lending Group was reluctant to push forward with its collection efforts and only did so when all else failed. Further, the Lending Group would agree that if this Court granted the Motion to Abstain that they would not foreclose on certain core assets consisting of certain approved patents that have generated income for the company, provided, of course, that there were no recriminations against them for exercising their remedies. That would leave assets that generated revenue with the company and would certainly be in the best interests of creditors. Of course, that would require certain assurances that no recrimination or action be

2503740.3

pursued against the Lending Group.  This is not an admission of any vulnerability in the Lending Group's position, but rather an effort to resolve what is an absolutely impossible situation that benefit no one.

In short, for the reasons set forth here, this is not a case suitable for this Court.  As a result, this Court should abstain and this case should be dismissed.

Respectfully Submitted,
SUMMERS COMPTON WELLS LLC

Date:  June 1, 2020       By:/s/ David A. Sosne
DAVID A. SOSNE (#28365MO)
BRIAN J. LAFLAMME (#49776MO)
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999/(314) 991-2413 Fax
Email:  dasattymo@summerscomptonwells.com
           blaflamme@summerscomptonwells.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served via electronic filing in the CM/ECF system of the United States Bankruptcy Court for the Eastern District of Missouri to the parties requesting service by electronic filing.  I hereby also certify that a copy of the foregoing was served via United States Mail, first class postage prepaid, on the date of the electronic filing of this document to those individuals and entities not requesting service by electronic filing.  The individuals and entities being served electronically or by mail are:

United States Department of Justice
U.S. Trustee's Office
111 S. Tenth Street, Ste. 6353
St. Louis, MO 63102

Robert E. Eggmann
Thomas Riske
Carmody MacDonald PC
120 South Central, Suite 1800
Clayton, MO 63105

Daniel D. Doyle
Lashly & Baer, P.C.
714 Locust Street
St. Louis, MO 63101

June 1, 2020                             /s/ Christina Hauck

2503740.3